**FILED**

OCT 1 1 2005

**MICHAEL W. DOBBINS**
**CLERK, U.S. DISTRICT COURT**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| STATE OF ILLINOIS, | ) | |
| STATE OF LOUISIANA, and the | ) | |
| STATE OF MONTANA | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | **05C 5809** |
| v. | ) | |
| | ) | |
| EXXON MOBIL CORPORATION and | ) | No. |
| EXXONMOBIL OIL CORPORATION | ) | |
| | ) | |
| Defendants. | ) | **JUDGE PALLMEYER** |
| | ) | |

**MAGISTRATE JUDGE LEVIN**

## COMPLAINT

The United States of America, by the authority of the Attorney General of the United

States and through the undersigned attorneys, acting at the request of the Administrator of the

United States Environmental Protection Agency ("EPA"); the State of Illinois ("Illinois"), by

and through the Attorney General of Illinois, on behalf of the People of the State of Illinois , and

at the request of the Illinois Environmental Protection Agency ("IEPA"); the State of Louisiana

("Louisiana"), by and through its Attorney General, on behalf of the people of the State of

Louisiana, and the Louisiana Department of Environmental Quality ("LDEQ"), by and through

its Secretary; and the State of Montana, ("Montana"), by the authority of the Montana Attorney

General, acting at the request of the Montana Department of Environmental Quality ("MDEQ"),

allege:

**NATURE OF ACTION**

1.      This is a civil action brought against Exxon Mobil Corporation and ExxonMobil

Oil Corporation (collectively referred to herein as "ExxonMobil" or the "Defendants") pursuant

to: (i) the Clean Air Act (the "CAA" ), 42 U.S.C. § 7401 et seq.; (ii) the Resource Conservation

and Recovery Act ("RCRA"), 42 U.S.C. § 6901 et seq.; (iii) the Clean Water Act (the "CWA"),

33 U.S.C. § 1251 et seq.; (iv) Sections 103(a) and 109(c) of the Comprehensive Environmental

Response, Compensation, and Liability Act, as amended ("CERCLA"), 42 U.S.C. § 9603(a) and

§ 9609(c); (v) Sections 304 and 325(b)(3) of the Emergency Planning and Community Right-to-

Know Act of 1986 ("EPCRA"), 42 U.S.C. § 11004 and § 11045(b)(3); (vi) the Illinois

Environmental Protection Act, 415 Ill. Comp. Stat. 5/1 et seq.; (vii) the Louisiana Environmental

Quality Act, La. Rev. Stat. Ann. § 30:2001 et seq.; and (viii) the Clean Air Act of Montana,

Mont. Code Ann. §§ 75-2-101 et seq.  This action seeks civil penalties and injunctive relief for

violation of certain requirements under those laws at Exxon Mobil Corporation's petroleum

refineries located in Baton Rouge, Louisiana (the "Baton Rouge Refinery"), Baytown, Texas

(the "Baytown Refinery"), and Billings, Montana (the "Billings Refinery"), and at ExxonMobil

Oil Corporation's petroleum refineries located in Beaumont, Texas (the "Beaumont Refinery"),

Joliet, Illinois (the "Joliet Refinery"), and Torrance, California (the "Torrance Refinery")

(collectively referred to herein as the "Covered Refineries").

2.      Upon information and belief, the Covered Refineries have been and are in

violation of EPA's regulations implementing the following Clean Air Act statutory and

regulatory requirements applicable to the petroleum refining industry:  (i) Prevention of

Significant Deterioration ("PSD"), Part C of Subchapter I of the Act, 42 U.S.C. § 7475, and the

regulations promulgated thereunder at 40 C.F.R. § 52.21, and Non-Attainment New Source

2

Review, Part D of Subchapter I of the Act, 42 U.S.C. §§ 7502-7503, and the regulations promulgated thereunder at 40 C.F.R. § 51.165, Part 51, Appendix S, and § 52.24; (ii) New Source Performance Standards promulgated at 40 C.F.R. Part 60, Subparts A and J; (iii) Leak Detection and Repair standards at 40 C.F.R. Part 60, Subparts VV and GGG, Part 61, Subparts J and V, and Part 63, Subparts F, H, and CC; and (iv) the National Emission Standards for Hazardous Air Pollutants for Benzene Waste Operations, 40 C.F.R. Part 61, Subpart FF.

3.     Upon information and belief, the Covered Refineries have been and are in violation of the Illinois Environmental Protection Act and its implementing regulations at 35 Ill. Adm. Code, Subtitle B, Part 201 et seq.; the Louisiana Environmental Quality Act, and its implementing regulations at the Environmental Regulatory Code Title 33:Part III; the Clean Air Act of Montana and its implementing regulations at the Administrative Rules of Montana, Title 17, Chapter 8; and the state implementation plans ("SIPs") of California, Illinois, Louisiana, Montana, and Texas which incorporate and/or implement the federal regulations cited in Paragraph 2.

4.     Upon information and belief, ExxonMobil's Joliet Refinery has been in violation of: (i) certain requirements imposed by RCRA, as detailed below in the Eighth Claim for Relief and Ninth Claim for Relief; (ii) certain requirements imposed by the CWA, as detailed below in the Tenth Claim for Relief; and (iii) certain reporting requirements imposed by CERCLA Section 103, 42 U.S.C. § 9603, and EPCRA Section 304, 42 U.S.C. § 11004, as detailed below in the Eleventh Claim for Relief.

5.     Upon information and belief, ExxonMobil's Billings Refinery has been in violation of: (i) certain requirements imposed by RCRA, as detailed below in the Twelfth Claim for Relief; (ii) certain requirements imposed by the CWA, as detailed below in the Thirteenth

3

Claim for Relief; and (iii) certain reporting requirements imposed by CERCLA Section 103 and EPCRA Section 304 as detailed below in the Eleventh Claim for Relief.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345, 1355, and 1367; CAA Sections 113(b) and 304(a), 42 U.S.C. §§ 7413(b) and 7604(a); RCRA Section 3008, 42 U.S.C. § 6928; CWA Section 309(b), 33 U.S.C. § 1319(b); CERCLA Sections 109(c) and 113(b), 42 U.S.C. § 9609(c) and § 9613(b); and EPCRA Section 325(b), 42 U.S.C. § 11045(b)(3).

7.     This Court has personal jurisdiction over the Defendants, each of which is a corporation doing business in the State of Illinois, pursuant to CAA Section 113(b), 42 U.S.C. § 7413(b); RCRA Section 3008, 42 U.S.C. § 6928; CWA Section 309(b), 33 U.S.C. § 1319(b); CERCLA Section 113(c), 42 U.S.C. § 9613(c); and EPCRA Section 325, 42 U.S.C. § 11045.

8.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c), and 1395(a); CAA Sections 113(b) and 304(c), 42 U.S.C. §§ 7413(b) and 7604(c); RCRA Section 3008(a), 42 U.S.C. § 6928(a); CWA Section 309(b), 33 U.S.C. § 1319(b); CERCLA Section 113(b), 42 U.S.C. § 9613(b); and EPCRA Section 325(b)(3), 42 U.S.C. § 11045(b)(3). The Defendants are found in and transact business in the Northern District of Illinois and certain acts or omissions which form the basis for claims asserted in this Complaint occurred within this district. In addition, the Defendants have agreed to this venue.

## NOTICE TO STATES

9.    The United States has provided notice of the commencement of this action to the State of California, the State of Illinois, the State of Louisiana, the State of Montana, and the State of Texas in accordance with the requirements of CAA Sections 113(a)(1) and 113(b), 42 U.S.C. § 7413(a)(1) and 113(b); RCRA Section 3008(a), 42 U.S.C. § 6928(a); and CWA Sections 309(a) and 309(b), 33 U.S.C. §§ 1319(a) and 1319(b).

## NOTICE TO THE EPA ADMINISTRATOR AND TO EXXONMOBIL

10.    Illinois, Louisiana, and Montana have each provided notice of the commencement of this action to the Administrator of EPA and to ExxonMobil in accordance with the requirements of CAA Section 304(b), 42 U.S.C. § 7604(b).

## DEFENDANTS

11.    Defendant Exxon Mobil Corporation owns and operates certain petroleum refineries in Baton Rouge, Louisiana; Baytown, Texas; and Billings, Montana which are the subject of this action.

12.    Defendant ExxonMobil Oil Corporation (formerly known as Mobil Oil Corporation) is a wholly-owned subsidiary of Exxon Mobil Corporation. ExxonMobil Oil Corporation owns and operates certain petroleum refineries in Beaumont, Texas; Joliet, Illinois; and Torrance, California which are the subject of this action.

13.    Each of the Defendants is a "person" as defined in: (i) CAA Section 302(e), 42 U.S.C. § 7602(e); (ii) RCRA Section 1004(15), 42 U.S.C. § 6903(15); (iii) CWA Section 502(2), 33 U.S.C. § 1362(5); and (iv) CERCLA Section 101(21),42 U.S.C. § 9601(21).

5

## GENERAL CLEAN AIR ACT ALLEGATIONS

14.     The Clean Air Act establishes a regulatory scheme designed to protect and enhance the quality of the nation's air so as to promote the public health and welfare and the productive capacity of its population.  CAA Section 101(b)(1), 42 U.S.C. § 7401(b)(1).

### New Source Review Requirements

15.     CAA Section 108(a), 42 U.S.C. § 7408(a), requires EPA to identify and prepare air quality criteria for each air pollutant, emissions of which may endanger public health or welfare and the presence of which results from numerous or diverse mobile or stationary sources. For each such "criteria" pollutant, CAA Section 109, 42 U.S.C. § 7409, requires EPA to promulgate national ambient air quality standards ("NAAQS") requisite to protect the public health and welfare.  Pursuant to CAA Sections 108 and 109, EPA has identified and promulgated NAAQS for sulfur dioxide ("$SO_2$"), nitrogen dioxide ("$NO_2$"), particulate matter ("PM"), carbon monoxide ("CO") and ozone as such pollutants.  40 C.F.R. §§ 50.4 - 50.11. Certain precursors to ozone formation, such as volatile organic compounds ("VOCs") and nitrogen oxides ("NOx") are regulated as part of the air quality standards for ozone itself.

16.     Under CAA Section 107(d), 42 U.S.C. § 7407(d), each state is required to designate those areas within its boundaries where the air quality is better or worse than the NAAQS for each criteria pollutant, or where the air quality cannot be classified due to insufficient data.  An area that meets the NAAQS for a particular pollutant is an "attainment" area.  An area that does not meet the NAAQS is a "nonattainment" area.  An area that cannot be classified due to insufficient data is "unclassifiable."

17.     CAA Section 110, 42 U.S.C. § 7410, requires each state to adopt and submit to EPA for approval a State Implementation Plan ("SIP") that provides for the attainment and

6

maintenance of the NAAQS. Upon EPA approval, SIP requirements are Federally enforceable under CAA Section 113, 42 U.S.C. §§ 7413(a), (b); 40 C.F.R. § 52.23.

18.     To help ensure attainment and maintenance of the NAAQS, the CAA requires a comprehensive new source review program (the "NSR" program) with two main facets, which are discussed in greater detail below. The NSR Program includes: (i) requirements governing the prevention of significant deterioration in areas designated as attaining the ambient air quality standards (the "PSD" program); and (ii) new source review requirements applicable to areas designated as non-attainment for a particular pollutant (the so-called "Nonattainment NSR" program).

19.     The PSD program and the Nonattainment NSR program both impose a variety of requirements for new or modified sources that would increase emissions of regulated pollutants, including requirements that the source owner/operator obtain a pre-construction permit and take steps to control air pollutant emissions from the source. As detailed below, EPA has promulgated its own PSD and Nonattainment NSR regulations, and many states have comparable regulations that are enforceable by EPA as part of each state's SIP.

### Prevention of Significant Deterioration Requirements

20.     Part C of Title I of the CAA, 42 U.S.C. §§ 7470-7492, sets forth requirements for the prevention of significant deterioration of air quality in those areas designated as attaining the NAAQS standards. The PSD program requirements are designed to protect public health and welfare, to assure that economic growth will occur in a manner consistent with the preservation of existing clean air resources and to assure that any decision to permit increased air pollution is made only after careful evaluation of all the consequences of such a decision and after public participation in the decision making process.

7

21.     CAA Section 165(a), 42 U.S.C. § 7475(a), prohibits the construction and subsequent operation of a major emitting facility in an area designated as attainment unless a PSD permit has been issued. Section 169(1) of the Act, 42 U.S.C. § 7479(1), defines "major emitting facility" as a source with the potential to emit 250 tons per year ("tpy") or more of any air pollutant.

22.     CAA Sections 110(a)(2)(C) and 161, 42 U.S.C. §§ 7410(a)(2)(C) and 7471, require states to adopt a SIP that contains emission limitations and such other measures as may be necessary to prevent significant deterioration of air quality in areas designated as attainment or unclassifiable. A state may comply with CAA Sections 110(a) and 161 by having its own PSD regulations approved as part of its SIP by EPA, which must be at least as stringent as those set forth at 40 C.F.R. § 51.166. If a state does not have a PSD program that has been approved by EPA and incorporated into the SIP, the federal PSD regulations set forth at 40 C.F.R. § 52.21 shall be incorporated by reference into the SIP. 40 C.F.R. § 52.21(a).

23.     As set forth at 40 C.F.R. § 52.21(k), the PSD program generally requires a person who wishes to construct or modify a major emitting facility in an attainment area to demonstrate, before construction commences, that construction of the facility will not cause or contribute to air pollution in violation of any ambient air quality standard or any specified incremental amount.

24.     As set forth at 40 C.F.R. § 52.21(i), any major emitting source in an attainment area that intends to construct a major modification must first obtain a PSD permit. "Major modification" is defined at 40 C.F.R. § 52.21(b)(2)(i) as meaning any physical change in or change in the method of operation of a major stationary source that would result in a significant net emission increase of any criteria pollutant subject to regulation under the Act. "Significant"

8

is defined at 40 C.F.R. § 52.21(b)(23)(i) in reference to a net emissions increase or the potential of a source to emit any of the following criteria pollutants, at a rate of emissions that would equal or exceed any of the following: for ozone, 40 tons per year of VOC; for CO, 100 tons per year; for NOx, 40 tons per year; for $SO_2$, 100 tons per year.

25.    As set forth at 40 C.F.R. § 52.21(j), a new major stationary source or a major modification in an attainment area shall install and operate best available control technology ("BACT") for each pollutant subject to regulation under the CAA that it would have the potential to emit in significant quantities.

26.    Pursuant to the PSD regulations, any owner or operator who commences construction or modification of a major source without applying for and receiving approval for such construction or modification is subject to an enforcement action.  40 C.F.R. § 52.21(s).

### Nonattainment New Source Review Requirements

27.    Part D of Title I of the CAA, 42 U.S.C. §§ 7501-7515, establishes NSR program requirements for areas designated as nonattainment for purposes of meeting the NAAQS standards.  The Nonattainment NSR program is intended to reduce emissions of air pollutants in areas that have not attained NAAQS so that the areas make progress towards meeting the NAAQS.  Prior to the effective date of the 1990 Clean Air Act Amendments, Pub. Law 101-549, effective November 15, 1990, the Nonattainment NSR provisions were set forth in 42 U.S.C. §§ 7501-08.

28.    Under CAA Section 172(c)(5), 42 U.S.C. § 7502(c)(5), a state is required to adopt Nonattainment NSR SIP rules that include provisions that require that all permits for the construction and operation of modified major stationary sources within nonattainment areas conform to the requirements of Section 173 of the CAA, 42 U.S.C. § 7503.  Section 173 of the

9

CAA, in turn, sets forth a series of requirements for the issuance of permits for major modifications to major stationary sources within nonattainment areas. 42 U.S.C. § 7503.

29. CAA Section 173, 42 U.S.C. § 7503, requires that, in order to obtain a Nonattainment NSR permit, the source must, among other things: (i) obtain federally enforceable emission offsets at least as great as the new source's emissions; (ii) comply with the lowest achievable emission rate as defined in CAA Section 171(3), 42 U.S.C. § 7501(3); and (iii) analyze alternative sites, sizes, production processes, and environmental control techniques for the proposed source and demonstrate that the benefits of the proposed source significantly outweigh the environmental and social costs imposed as a result of its location, construction, or modification.

30. CAA Section 182(f), 42 U.S.C. § 7511a(f), sets forth requirements to take effect no later than November 15, 1992, relating to the construction and operation of new or modified major stationary sources of NOx located within nonattainment areas for ozone. Section 182(f) defines NOx as a pollutant that must be treated as a contributor to the criteria pollutant ozone. For the purposes of 42 U.S.C. § 7511a, a "major stationary source" of NOx is one that emits or has the potential to emit 100 tons per year or more of a regulated pollutant. A "significant" net emissions increase of NOx is one that would result in increased emissions of 40 tons per year or more. 42 U.S.C. § 7511a.

31. As set forth in 40 C.F.R. § 52.24, no major stationary source shall be constructed or modified in any nonattainment area as designated in 40 C.F.R. Part 81, Subpart C to which any SIP applies, if the emissions from such source will cause or contribute to concentrations of any pollutant for which a NAAQS is exceeded in such area, unless, as of the time of application

10

for a permit for such construction, such plan meets the requirements of Part D, Title I, of the CAA.

## Flaring and New Source Performance Standards

32.     CAA Section 111(b)(1)(A), 42 U.S.C. § 7411(b)(1)(A), requires the Administrator of EPA to publish a list of categories of stationary sources that emit or may emit any air pollutant. The list must include any categories of sources which are determined to cause or significantly contribute to air pollution which may endanger public health or welfare.

33.     CAA Section 111(b)(1)(B), 42 U.S.C. § 7411(b)(1)(B), requires the Administrator of EPA to promulgate regulations establishing federal standards of performance for new sources of air pollutants within each of these categories. "New sources" are defined as stationary sources, the construction or modification of which is commenced after the publication of the regulations or proposed regulations prescribing a standard of performance applicable to such source. 42 U.S.C. § 7411(a)(2).

34.     Pursuant to CAA Section 111(b)(1)(A), 42 U.S.C. § 7411(b)(1)(A), EPA has identified petroleum refineries as one category of stationary sources that cause, or contribute significantly to, air pollution that may reasonably be anticipated to endanger public health or welfare.

35.     Pursuant to CAA Section 111(b)(1)(B), 42 U.S.C. § 7411(b)(1)(B), EPA promulgated New Source Performance Standards ("NSPS") for various industrial categories, including petroleum refineries. NSPS requirements for petroleum refineries are codified at 40 C.F.R. Part 60, Subpart J, §§ 60.100-60.109.

36.     The provisions of 40 C.F.R. Part 60, Subpart J, apply to specified "affected

11

facilities," including, inter alia, Claus sulfur recovery plants that have a capacity greater than 20 long tons per day and that commenced construction or modification after October 4, 1976, and all fluid catalytic cracking unit catalyst regenerators and fuel gas combustion devices that commenced construction or modification after June 11, 1973. 40 C.F.R. § 60.100(a),(b).

37.     40 C.F.R. § 60.102(a) establishes an emission limitation that generally prohibits the discharge into the atmosphere from any affected fluid catalytic cracking unit catalyst regenerator of: (i) particulate matter in excess of 1.0 kg/1000 kg (1.0 lb/1000 lb) of coke burn-off in the catalyst regenerator; and (ii) gases exhibiting greater than 30 percent opacity, except for one six-minute average opacity reading in any one hour period.

38.     40 C.F.R. § 60.103(a) establishes an emission limitation that prohibits the discharge into the atmosphere from any catalytic cracking unit catalyst regenerator any gases that contain CO in excess of 500 ppm by volume (dry basis).

39.     Pursuant to 40 C.F.R. § 60.104(b), the owner or operator of each affected fluid catalytic cracking unit catalyst regenerator shall comply with one of the emission limitations for control of $SO_2$ emissions set forth in 40 C.F.R. § 60.104(b)(1), (2), or (3).

40.     40 C.F.R. § 60.104(a)(2) establishes an emission limitation that prohibits an affected Claus sulfur recovery plant with a reduction control system followed by incineration from discharging in excess of 250 ppm by volume (dry basis) of $SO_2$ at zero percent excess air. 40 C.F.R. § 60.104(a)(2) establishes an emission limitation that prohibits an affected Claus sulfur recovery plant with a reduction control system not followed by incineration from discharging in excess of 300 ppm by volume of reduced sulfur compounds and in excess of 10 ppm by volume of hydrogen sulfide, each calculated as ppm $SO_2$ by volume (dry basis) at zero percent excess air.

12

41. 40 C.F.R. § 60.104(a)(1) establishes an emission limitation that prohibits the burning in any affected fuel gas combustion device any fuel gas that contains hydrogen sulfide in excess of 230 milligrams per dry standard cubic meter, or, stated in terms of grains per dry standard cubic foot, 0.10. The combustion in a flare of process upset gases or fuel gas that is released to the flare as a result of relief valve leakage or other emergency malfunctions is exempt from the emission limit imposed by 40 C.F.R. § 60.104(a)(1).

42. Pursuant to CAA Section 111(b), 42 U.S.C. § 7411(b), EPA has promulgated general NSPS provisions, codified at 40 C.F.R. Part 60, Subpart A, §§ 60.1-60.19, that apply to owners or operators of any stationary source that contains an "affected facility" subject to regulation under 40 C.F.R. Part 60.

43. 40 C.F.R. § 60.11(d) requires that at all times, including periods of startup, shutdown, and malfunction, owners and operators shall, to the extent practicable, maintain and operate any affected facility including associated air pollution control equipment in a manner consistent with good air pollution control practice for minimizing emissions.

44. CAA Section 111(e), 42 U.S.C. § 7411(e), prohibits the operation of any new source in violation of an NSPS applicable to such source. Thus, a violation of an NSPS requirement is a violation of CAA Section 111(e).

### Leak Detection and Repair

45. Several sets of EPA regulations establish leak detection and repair ("LDAR") requirements applicable to certain types of equipment at petroleum refineries. First, pursuant to CAA Section 111, 42 U.S.C. § 7411, EPA promulgated NSPS Standards of Performance for Equipment Leaks of VOC in Petroleum Refineries at 40 C.F.R. Part 60, Subpart GGG. Subpart GGG, in turn, incorporates many of the NSPS requirements at 40 C.F.R. Part 60, Subpart VV.

13

Second, pursuant to CAA Section 112, 42 U.S.C. § 7412, EPA promulgated national emission

standards for hazardous air pollutants ("NESHAP") at 40 C.F.R. Part 61, and NESHAP

requirements for particular source categories at 40 C.F.R. Part 63. The relevant NESHAP

requirements are found at 40 C.F.R. Part 61, Subpart J (for equipment leaks of benzene) and

Subpart V (for equipment leaks); and 40 C.F.R. Part 63, Subpart F (for organic hazardous air

pollutants from the synthetic organic chemical manufacturing industry), Subpart H (for organic

hazardous air pollutants for equipment leaks) and Subpart CC (for hazardous air pollutants from

petroleum refineries).

46.     The focus of the LDAR program is the refinery-wide inventory of all possible

leaking equipment, the regular monitoring of that equipment to identify leaks, and the repair of

leaks as soon as they are identified.

### Benzene Waste NESHAP

47.     The CAA requires EPA to establish emission standards for each "hazardous air

pollutant" ("HAP") in accordance with Section 112 of the CAA, 42 U.S.C. § 7412.

48.     In March 1990, EPA promulgated national emission standards applicable to

benzene-containing waste streams. Benzene is a listed HAP and a known carcinogen. The

benzene waste regulations are set forth at 40 C.F.R. Part 61, Subpart FF (National Emission

Standard for Benzene Waste Operations). Benzene is a naturally-occurring constituent of

petroleum, petroleum products, and petroleum waste and is highly volatile. Benzene emissions

can often be detected anywhere in a refinery where the petroleum product or waste materials are

exposed to the ambient air.

49.     Pursuant to the benzene waste NESHAP, refineries are required to calculate the

total annual benzene ("TAB") content in their waste streams. If the TAB is over 10 megagrams,

14

the refinery is required to elect a control option that will require the control of all waste streams, or control of certain select waste streams.

## CAA Enforcement Provisions

50. CAA Section 113(b), 42 U.S.C. § 7413(b), authorizes the United States to commence a civil action for a permanent or temporary injunction, and/or for a civil penalty, whenever any person has violated: (i) any requirement or prohibition of any applicable SIP or permit; or (ii) any other requirement or prohibition under a pertinent provision of the CAA, including, but not limited to, any NSPS or NESHAP requirement.

51. CAA Section 167, 42 U.S.C. § 7477, authorizes the United States to initiate an action for injunctive relief, as necessary to prevent the construction, modification or operation of a major emitting facility which does not conform to the PSD program requirements.

52. As provided by CAA Section 113(b), 42 U.S.C. § 7413(b), the Civil Penalties Inflation Adjustment Act of 1990 ("CPIAA"), 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701, and EPA regulations codified at 40 C.F.R. Part 19, any person who violates pertinent requirements of the CAA shall be liable for a civil penalty of up to: (i) $25,000 per day for each such violation occurring on or before January 30, 1997; (ii) $27,500 per day for each violation occurring between January 30, 1997 and March 15, 2004; and (iii) $32,500 per day for each violation occurring after March 15, 2004.

53. Pursuant to CAA Section 304(a)(3), 42 U.S.C. § 7604(a)(3), Illinois, Louisiana, and Montana are each authorized to commence a civil action against any person who is alleged to have violated NSR program requirements under Parts C or D of Title I of the CAA.

15

54.     Pursuant to CAA Section 304(a)(1), 42 U.S.C. § 7604(a)(1), Illinois, Louisiana, and Montana are each authorized to commence a civil action against any person who is alleged to have violated any emission standard or limitation under the CAA.

### Illinois Environmental Protection Act Requirements and Enforcement Provisions

55.     The Illinois Environmental Protection Act ( the "Illinois Act") and implementing regulations require that any person who constructs or modifies a major stationary source must first obtain a permit.  415 Ill. Comp. Stat. 5/39.5; Ill. Admin. Code tit. 35, Part 203.  The Illinois Act, 415 Ill. Comp. Stat. 5/9.1(a-f), requires any person who constructs, reconstructs, installs or modifies new equipment or control apparatus to incorporate advances in the art of air pollution control as provided by federal and state law and to install the applicable air pollution control technology.  The regulations implementing the Illinois Act require persons who construct, reconstruct or modify equipment or control apparatus in non-attainment areas to secure emission offsets.  Ill. Admin. Code tit. 35, Part 203.  Pursuant to Section 4 of the Illinois Act, 415 Ill. Comp. Stat. 5/4, and implementing regulations at Ill. Admin. Code tit. 35, Part 203 et seq., IEPA is authorized to enforce the Illinois Act.

### Louisiana Environmental Quality Act Requirements and Enforcement Provisions

56.     The Louisiana Environmental Quality Act (the "Louisiana Act") and its implementing regulations require that any person who constructs or modifies a major stationary source must first obtain a permit.  La. Rev. Stat. Ann. §§ 30:2055, 30:2057; La. Admin. Code tit. 33, III § 509.I.1.  Pursuant to the Louisiana Act, La. Rev. Stat. Ann. § 30:2001 et seq., and La. Rev. Stat. § 30:2025(G) in particular, LDEQ is authorized to enforce the Louisiana Act and to institute an action for injunctive relief and civil penalties.

16

**Clean Air Act of Montana Requirements and Enforcement Provisions**

57.     The Clean Air Act of Montana and its implementing regulations require that a person obtain a permit before constructing or modifying a major stationary source. Mont. Code Ann. § 75-2-211; Mont. Admin. R. 17.8.748. Montana is empowered to enforce those requirements by an action for injunctive relief and civil penalties under Mont. Code Ann. §§ 75-2-401 and 75-2-413.

## GENERAL RCRA ALLEGATIONS

58.     Subtitle C of RCRA establishes a comprehensive regulatory program for the management of hazardous wastes, from their initial generation until their final disposal. 42 U.S.C. §§ 6921-6939. EPA has promulgated regulations pursuant to RCRA Subtitle C that set forth the standards and requirements that are applicable to generators and transporters of hazardous waste and to owners and operators of facilities that treat, store, or dispose of hazardous waste. These regulations are found at 40 C.F.R. Parts 260 through 282.

59.     RCRA Section 3001, 42 U.S.C. § 6921(b), authorizes EPA to promulgate regulations identifying the characteristics of hazardous waste, and listing particular hazardous wastes which will be subject to regulations under RCRA. Pursuant to that authority, EPA promulgated the regulations codified at 40 C.F.R. Part 261 ("Part 261"). Under Part 261, a waste is deemed hazardous if, inter alia, it exhibits the characteristics of ignitability, corrosivity, reactivity, or toxicity (a "characteristic hazardous waste"), or if, inter alia, the waste is otherwise listed in Part 261 as hazardous (a "listed hazardous waste"). 40 C.F.R. Part 261, Subparts C and D.

60.     RCRA Section 3002, 42 U.S.C. § 6922(a), authorizes EPA to promulgate regulations establishing standards applicable to "generators" of hazardous waste. Under 40

C.F.R. § 260.10, a "generator" means, inter alia, "any person, by site, whose act or process produces hazardous waste identified or listed in Part 261." The EPA standards and requirements applicable to "generators" are found at 40 C.F.R. Part 262.

61.     RCRA Section 3004, 42 U.S.C. § 6924(a), authorizes EPA to promulgate regulations establishing standards applicable to owners and operators of hazardous waste treatment, storage, and disposal facilities. The EPA standards and requirements applicable to owners and operators of hazardous waste treatment, storage, and disposal facilities are found at 40 C.F.R. Parts 264 and 265.

62.     RCRA Section 3005, 42 U.S.C. § 6925(a), requires that owners and operators of treatment, storage, and disposal facilities obtain permits for such facilities. EPA's requirements for such permits are found at 40 C.F.R. Part 270.

63.     In 1984, Congress amended RCRA to restrict the land disposal of hazardous wastes. 42 U.S.C. §§ 6924(d)-(k), (m). These land disposal restrictions ("LDRs") prohibit the placement of hazardous wastes on the land unless such wastes either comply with EPA-specified treatment levels or are determined by EPA to be protective of human health and the environment for as long as the wastes remain hazardous.

64.     Pursuant to RCRA Section 3006(b), 42 U.S.C. § 6926(b), any state may apply for and receive EPA authorization to administer and enforce the state's own hazardous waste management program, provided the state requirements are consistent with and equivalent to federal requirements under RCRA.

65.     EPA initially authorized the State of Illinois's hazardous waste program in 1986. 40 C.F.R. § 272.700. The State's authorization has been periodically updated, and the regulations governing the State's hazardous waste management program are found at Ill. Admin.

18

Code tit. 35, Part 702 et seq. EPA regulations incorporate the State's hazardous waste management regulations by reference, 40 C.F.R. § 272.701, and RCRA Section 3008 makes those State regulations enforceable by the United States, as well as the State, 42 U.S.C. § 6928(a).

66.     EPA initially authorized the State of Montana's hazardous waste program in 1984. 40 C.F.R. § 272.1350. The State's authorization has been periodically updated, and the regulations governing the State's hazardous waste management program are found at Mont. Admin. R. 17.53.101 et seq. EPA regulations incorporate the State's hazardous waste management regulations by reference, 40 C.F.R. § 272.1351, and RCRA Section 3008 makes those State regulations enforceable by the United States, as well as the State, 42 U.S.C. § 6928(a).

67.     Subject to limited exceptions, hazardous waste generators are prohibited from accumulating hazardous waste at a facility for more than 90 days, unless the facility is specially approved for that purpose, and complies with requirements applicable to hazardous waste treatment, storage, and disposal facilities. 40 C.F.R. § 262.34; 40 C.F.R. Parts 264, 265, and 270; Ill. Admin. Code tit. 33, § 722.134; Ill Admin. Code tit. 33, Parts 702, 703, 724, and 725; Mont. Admin. R. 17.53.601, 17.53.801, 17.53.901, and 17.53.1201.

68.     The Federal regulations and Illinois and Montana regulations implementing RCRA's LDR requirements are codified at 40 C.F.R. Part 268, Ill. Admin. Code tit. 35, Part 728, and Mont. Admin. R. 17.53.1101. Among other things, those regulations: (i) identify hazardous wastes that are restricted from land disposal; (ii) define those limited circumstances under which an otherwise prohibited waste may continue to be land disposed; and (iii) provide that waste must no longer exhibit a prohibited characteristic of hazardous waste at the point of land disposal

19

(i.e., placement in a surface impoundment).  40 C.F.R. § 268.1(c)(4)(iv); Ill. Admin. Code tit. 35, § 728.101; Mont. Admin. R. 17.53.1101.

69.     RCRA Section 3008(a), 42 U.S.C. § 6928(a), provides that whenever, on the basis of any information, EPA determines that any person has violated or is violating any requirement of RCRA, the United States may file a civil action in federal district court to obtain appropriate relief, including a temporary or permanent injunction.

70.     As provided by RCRA Section 3008(g), 42 U.S.C. § 6928(g), the CPIAA, and EPA regulations codified at 40 C.F.R. Part 19, any person who violates pertinent requirements of RCRA shall be liable for a civil penalty of up to:  (i) $25,000 per day for each such violation occurring on or before January 30, 1997; (ii) $27,500 per day for each violation occurring between January 30, 1997 and March 15, 2004; and (iii) $32,500 per day for each violation occurring after March 15, 2004.

## GENERAL CWA ALLEGATIONS

71.     CWA Section 301(a), 33 U.S.C. § 1311(a), prohibits the discharge of pollutants by any person into navigable waters of the United States, except in compliance with the CWA. The discharge of pollutants may be authorized by the terms and conditions of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to CWA Section 402, 33 U.S.C. § 1342, but only in compliance with the applicable requirements of CWA Section 301, 33 U.S.C. § 1311, and such other conditions as EPA determines are necessary to carry out the provisions of the CWA.

72.     Illinois is authorized by EPA, pursuant to CWA Section 402(b), 33 U.S.C. § 1342, to administer an NPDES permit program for discharges into navigable waters within the

State of Illinois. Illinois has issued an NPDES permit for ExxonMobil Oil Corporation's Joliet Refinery.

73.     Montana is authorized by EPA, pursuant to CWA Section 402(b), 33 U.S.C. § 1342, to administer an NPDES permit program for discharges into navigable waters within the State of Montana. Montana has issued an NPDES permit for Exxon Mobil Corporation's Billings Refinery.

74.     Pursuant to CWA Section 309(b), 33 U.S.C. § 1319(b), the United States may commence a civil action for appropriate relief when any person is in violation of, inter alia, CWA Section 301, 33 U.S.C. § 1311, or any permit condition or limitation in an NPDES permit that is issued by EPA or by a state under CWA Section 402, 33 U.S.C. § 1342. Such appropriate relief includes a permanent or temporary injunction.

75.     As provided by CWA Section 309(d), 33 U.S.C. § 1319(d), the CPIAA, and EPA regulations codified at 40 C.F.R. Part 19, any person who violates pertinent requirements of the CWA, or who violates any condition or limitation in an NPDES permit that is issued by EPA or by a state under CWA Section 402, 33 U.S.C. § 1342, shall be liable for a civil penalty of up to: (i) $25,000 per day for each such violation occurring on or before January 30, 1997; (ii) $27,500 per day for each violation occurring between January 30, 1997 and March 15, 2004; and (iii) $32,500 per day for each violation occurring after March 15, 2004.

## **GENERAL CERCLA AND EPCRA ALLEGATIONS**

76.     CERCLA Section 103(a), 42 U.S.C. § 9603(a), requires a person in charge of a facility to immediately notify the National Response Center of a release of a hazardous substance from such facility in an amount equal to or greater than the amount determined pursuant to Section 102 of CERCLA, 42 U.S.C. § 9602 (the "reportable quantity"). EPA's regulations

21

setting forth requirements for CERCLA Section 103 reporting are codified at 40 C.F.R. Part 302, and include a list of hazardous substances and their reportable quantities.  See 40 C.F.R. § 302.4.

77.     As provided by CERCLA Section 109(c)(1), 42 U.S.C. § 9609(c)(1), the CPIAA, and EPA regulations codified at 40 C.F.R. Part 19, any person who violates the notification requirements of CERCLA Section 103(a), 42 U.S.C. § 9603(a), shall be liable to the United States for civil penalties in an amount not to exceed: (i) $25,000 per day for each day the violation continues, and $75,000 per day for each day that any second or subsequent violation continues, for any violation that occurred on or before January 30, 1997; (ii) $27,500 per day for each day the violation continues, and $82,500 per day for each day that any second or subsequent violation continues, for any violation that occurred between January 30, 1997 and March 15, 2004; and (iii) $32,500 per day for each day the violation continues, and $97,500 per day for each day that any second or subsequent violation continues, for any violation that occurred after March 15, 2004.

78.     EPCRA Section 304(a), 42 U.S.C. § 11004(a), and 40 C.F.R. § 355.40 require the owner and operator of a facility at which a hazardous chemical is produced, used, or stored, to immediately notify the State Emergency Response Commission ("SERC") and the Local Emergency Planning Committee ("LEPC") of certain specified releases of a hazardous or extremely hazardous substance. EPA's regulations setting forth requirements for EPCRA Section 304 reporting are codified at 40 C.F.R. Part 355, and include a list of extremely hazardous substances and their reportable quantities.  See 40 C.F.R. Part 355, Appendices A and B.

79.     EPCRA Section 304(c), 42 U.S.C. § 11004(c), requires that, as soon as practicable after a release which requires notice under EPCRA Section 304(a), 42 U.S.C.

22

§ 11004(a), the owner or operator shall provide a written followup emergency notification providing certain specified additional information.

80.     As provided by EPCRA Section 325(b)(3), 42 U.S.C. § 11045(b)(3), the CPIAA, and EPA regulations codified at 40 C.F.R. Part 19, any person who violates the notification requirements of EPCRA Section 304, 42 U.S.C. § 11004, shall be liable to the United States for civil penalties in an amount not to exceed:  (i)  $25,000 per day for each day the violation continues, and $75,000 per day for each day that any second or subsequent violation continues, for any violation on or before January 30, 1997; (ii) $27,500 per day for each day the violation continues, and $82,500 per day for each day that any second or subsequent violation continues, for any violation that occurred between January 30, 1997 and March 15, 2004; and (iii) $32,500 per day for each day the violation continues, and $97,500 per day for each day that any second or subsequent violation continues, for any violation that occurred after March 15, 2004.

### FIRST CLAIM FOR RELIEF
**(CAA:  NSR Violations at FCCUs and Heaters and Boilers)**

81.     Paragraphs 1 through 80 are realleged and incorporated by reference as if fully set forth herein.

82.     ExxonMobil owns and operates one or more fluidized catalytic cracking units ("FCCUs") at each of the Covered Refineries.

83.     Upon information and belief, ExxonMobil has modified certain of those FCCUs at the Covered Refineries.

84.     Upon information and belief, certain of those FCCU modifications constituted a "major modification" under the CAA and the applicable NSR program regulations, to existing

major stationary sources, that resulted in a significant net emissions increase of one or more regulated criteria pollutants, including $SO_2$ and/or NOx.

85.     Since the initial construction or major modification of certain of those FCCUs, ExxonMobil has been in violation of the CAA and the applicable NSR program regulations, by failing to undergo an appropriate new source review, by failing to obtain required NSR permits, and by failing to install and operate the best available control technology for the control of those pollutants for which a significant net emissions increase occurred.

86.     ExxonMobil owns and operates multiple heaters and/or boilers at each of the Covered Refineries.

87.     Upon information and belief, ExxonMobil has modified certain of those heaters and/or boilers at the Covered Refineries.

88.     Upon information and belief, certain of those heater/boiler modifications constituted a "major modification" under the CAA and the applicable NSR program regulations, to existing major stationary sources, that resulted in a significant net emissions increase of one or more regulated criteria pollutants, including $SO_2$ and/or NOx.

89.     Since the initial construction or major modification of certain of those heaters/boilers, ExxonMobil has been in violation of the CAA and the applicable NSR program regulations, by failing to undergo an appropriate new source review, by failing to obtain required NSR permits, and by failing to install and operate the best available control technology for the control of those pollutants for which a significant net emissions increase occurred.

90.     Unless restrained by an Order of the Court, these violations of the CAA and the applicable NSR program regulations will continue.

24

91.     ExxonMobil's violations of the CAA, as set forth in this Claim for Relief, make the Defendants subject to injunctive relief and civil penalties of up to:  (i) $25,000 per day for each violation on or before January 30, 1997; (ii) $27,500 per day for each violation between January 30, 1997 and March 15, 2004; and (iii) $32,500 per day for each violation occurring after March 15, 2004.

## SECOND CLAIM FOR RELIEF
### (CAA: NSPS Subpart J Violations at the FCCU Catalyst Regenerators)

92.     Paragraphs 1 through 91 are realleged and incorporated by reference as if fully set forth herein.

93.     ExxonMobil is the "owner" and/or "operator," within the meaning of CAA Section 111(a)(5), 42 U.S.C. § 7411(a)(5), and 40 C.F.R. § 60.2, of one or more fluidized catalytic cracking unit regenerators ("FCCU regenerators") at each of the Covered Refineries.

94.     Each such FCCU regenerator is a "fluid catalytic cracking unit catalyst regenerator" within the meaning of 40 C.F.R. § 60.101(n), and a "stationary source" within the meaning of CAA Sections 111(a)(3) and 302(z), 42 U.S.C. §§ 7411(a)(3) and 7602(z).

95.     Upon information and belief, certain of those FCCU regenerators are "affected facilities" within the meaning of 40 C.F.R. §§ 60.2 and 60.100(a), and "new sources" within the meaning of CAA Section 111(a)(2), 42 U.S.C. § 7411(a)(2), with respect to certain regulated pollutants, including $SO_2$, CO, PM, and/or opacity.

96.     Each such FCCU regenerator is subject to the General Provisions of the NSPS, 40 C.F.R. Part 60, Subpart A, and to the Standards of Performance for Petroleum Refineries, 40 C.F.R. Part 60, Subpart J, with respect to certain regulated pollutants, including $SO_2$, CO, PM, and/or opacity.

25

97.     Among other requirements imposed by NSPS Subpart J, air emissions from each such FCCU regenerator are subject to the applicable NSPS Subpart J emission limitations for $SO_2$, CO, PM, and/or opacity.

98.     Upon information and belief, certain of the FCCU regenerators at the Covered Refineries that are "affected facilities" under NSPS Subpart J have been operated in violation of the applicable NSPS Subpart J emission limitations for $SO_2$, CO, PM, and/or opacity.

99.     Unless restrained by an Order of the Court, these violations of the CAA and the applicable NSPS regulations will continue.

100.     ExxonMobil's violations of the CAA, as set forth in this Claim for Relief, make the Defendants subject to injunctive relief and civil penalties of up to:  (i) $25,000 per day for each violation on or before January 30, 1997; (ii) $27,500 per day for each violation between January 30, 1997 and March 15, 2004; and (iii) $32,500 per day for each violation occurring after March 15, 2004.

### THIRD CLAIM FOR RELIEF
### (CAA: NSPS Subpart J Violations at Sulfur Recovery Plants)

101.     The allegations in Paragraphs 1 through 100 are hereby realleged and incorporated by reference as if fully set forth herein.

102.     ExxonMobil is the "owner" and/or "operator," within the meaning of CAA Section 111(a)(5), 42 U.S.C. § 7411(a)(5), and 40 C.F.R. § 60.2, of a sulfur recovery plant ("SRP") at each of the Covered Refineries, other than the Billings Refinery.

103.     Each such SRP is a "Claus sulfur recovery plant" within the meaning of 40 C.F.R. § 60.101(i), and a "stationary source" within the meaning of CAA Sections 111(a)(3) and 302(z), 42 U.S.C. §§ 7411(a)(3) and 7602(z).

104.    Each such SRP has a capacity of more than 20 long tons of sulfur per day.

105.    Upon information and belief, certain of those SRPs are "affected facilities" within the meaning of 40 C.F.R. §§ 60.2 and 60.100(a), and "new sources" within the meaning of CAA Section 111(a)(2), 42 U.S.C. § 7411(a)(2).

106.    Each such SRP is subject to the General Provisions of the NSPS, 40 C.F.R. Part 60, Subpart A, and to the Standards of Performance for Petroleum Refineries, 40 C.F.R. Part 60, Subpart J.

107.    Among other requirements imposed by NSPS Subpart J, air emissions from each such SRP are subject to the applicable NSPS Subpart J emission limitations for Claus sulfur recovery plants.

108.    Upon information and belief, certain of the SRPs at the Covered Refineries that are "affected facilities" under NSPS Subpart J have been operated in violation of the applicable NSPS Subpart J emission limitations for Claus sulfur recovery plants.

109.    Unless restrained by an Order of the Court, these violations of the CAA and the applicable NSPS regulations will continue.

110.    ExxonMobil's violations of the CAA, as set forth in this Claim for Relief, make the Defendants subject to injunctive relief and civil penalties of up to:  (i) $25,000 per day for each violation on or before January 30, 1997; (ii) $27,500 per day for each violation between January 30, 1997 and March 15, 2004; and (iii) $32,500 per day for each violation occurring after March 15, 2004.

**FOURTH CLAIM FOR RELIEF**
**(CAA: NSPS Subpart J Violations at Flaring Devices and Heaters and Boilers)**

111.    The allegations in Paragraphs 1 through 110 are hereby realleged and incorporated by reference as if fully set forth herein.

112.    ExxonMobil is the "owner" and/or "operator," within the meaning of CAA Section 111(a)(5), 42 U.S.C. § 7411(a)(5), and 40 C.F.R. § 60.2, of flaring devices and heaters and boilers located at each of the Covered Refineries.

113.    Each such flaring device, heater, or boiler is a "fuel gas combustion device" within the meaning of 40 C.F.R. § 60.101(g), and a "stationary source" within the meaning of CAA Sections 111(a)(3) and 302(z), 42 U.S.C. §§ 7411(a)(3) and 7602(z).

114.    Upon information and belief, certain of those flaring devices, heaters, and/or boilers are "affected facilities" within the meaning of 40 C.F.R. §§ 60.2 and 60.100(a), and "new sources" within the meaning of CAA Section 111(a)(2), 42 U.S.C. § 7411(a)(2).

115.    Each such flaring device, heater, and/or boiler is subject to the General Provisions of the NSPS, 40 C.F.R. Part 60, Subpart A, and to the Standards of Performance for Petroleum Refineries, 40 C.F.R. Part 60, Subpart J.

116.    Among other requirements imposed by NSPS Subpart J, each such flaring device, heater, and/or boiler is subject to the applicable NSPS Subpart J emission limitations for fuel gas combustion devices.

117.    Upon information and belief, certain of the flaring devices, heaters, and/or boilers at the Covered Refineries that are "affected facilities" under NSPS Subpart J have been operated in violation of the applicable NSPS Subpart J emission limitations for fuel gas combustion devices.

118.    Unless restrained by an Order of the Court, these violations of the CAA and the applicable NSPS regulations will continue.

119.    ExxonMobil's violations of the CAA, as set forth in this Claim for Relief, make the Defendants subject to injunctive relief and civil penalties of up to:  (i) $25,000 per day for each violation on or before January 30, 1997; (ii) $27,500 per day for each violation between January 30, 1997 and March 15, 2004; and (iii) $32,500 per day for each violation occurring after March 15, 2004.

## FIFTH CLAIM FOR RELIEF
### (CAA:  NSPS Subpart A, 40 C.F.R. § 60.11(d))
### (Failing to Operate and Maintain the FCCU Regenerators, Sulfur Recovery Plants, Heaters and Boilers, and Flaring Devices in a Manner Consistent with Good Air Pollution Control Practice)

120.    The allegations in Paragraphs 1 through 119 are hereby realleged and incorporated by reference as if fully set forth herein.

121.    Upon information and belief, under circumstances that did not represent good air pollution control practices, ExxonMobil has emitted certain of the following pollutants in violation of 40 C.F.R. § 60.11(d):  (i) $SO_2$, PM, and/or CO from certain FCCU regenerators at the Covered Refineries; and (ii) $SO_2$ from certain SRPs, flaring devices, heaters, and/or boilers at the Covered Refineries.

122.    Unless restrained by an Order of the Court, these violations of the CAA and the applicable NSPS regulations will continue.

123.    ExxonMobil's violations of the CAA, as set forth in this Claim for Relief, make the Defendants subject to injunctive relief and civil penalties of up to:  (i) $25,000 per day for each violation on or before January 30, 1997; (ii) $27,500 per day for each violation between

29

January 30, 1997 and March 15, 2004; and (iii) $32,500 per day for each violation occurring after March 15, 2004.

## SIXTH CLAIM FOR RELIEF
### (Leak Detection and Repair Requirements)

124.    The allegations in Paragraphs 1 through 123 are realleged and incorporated by reference as if fully set forth herein.

125.    ExxonMobil is required under 40 C.F.R. Part 60, Subpart GGG, to comply with standards set forth at 40 C.F.R. § 60.592, which references standards set forth at 40 C.F.R. §§ 60.482-1 to 60.482-10, and alternative standards set forth at 40 C.F.R. §§ 60.483-1 to 60.483-2, for certain of its refinery equipment in light liquid and gas and/or vapor service, constructed or modified after January 4, 1983.

126.    Pursuant to 40 C.F.R. § 60.483-2(b)(1), an owner or operator of valves in light liquid and gas and/or vapor service must initially comply with the LDAR requirements set forth in 40 C.F.R. § 60.482-7, including the use of Standard Method 21 to monitor for such leaks.

127.    Pursuant to 40 C.F.R. Part 61, Subpart J, ExxonMobil is required to comply with the LDAR requirements set forth in 40 C.F.R. Part 61, Subpart V, for certain specified equipment in light liquid and gas and/or vapor benzene service.

128.    Upon information and belief, ExxonMobil has violated such LDAR requirements at certain Covered Refineries by failing to: (i) accurately monitor certain valves and other components as required by Standard Method 21; (ii) report the valves and other components that were leaking; and/or (iii) repair leaking valves and other components in a timely manner.

129.    Unless restrained by an Order of the Court, these violations of the CAA and the applicable LDAR regulations will continue.

130.    ExxonMobil's violations of the CAA, as set forth in this Claim for Relief, make the Defendants subject to injunctive relief and civil penalties of up to: (i) $25,000 per day for each violation on or before January 30, 1997; (ii) $27,500 per day for each violation between

January 30, 1997 and March 15, 2004; and (iii) $32,500 per day for each violation occurring after March 15, 2004.

## SEVENTH CLAIM FOR RELIEF
### (Benzene Waste NESHAP)

131. The allegations in Paragraphs 1 through 130 are hereby re-alleged and incorporated by reference as if fully set forth herein.

132. At times relevant to this Complaint, each of the Covered Refineries had a total annual benzene quantity from refinery waste of over 10 Mg/yr, and each such Covered Refinery has been subject to the requirements of the Benzene Waste NESHAP regulations set forth at 40 C.F.R. § 61.342.

133. Upon information and belief, at certain Covered Refineries, ExxonMobil has violated Benzene Waste NESHAP requirements by failing to manage and treat benzene-containing facility waste in accordance with the standards established by 40 C.F.R. § 61.342.

134. Unless restrained by an Order of the Court, these violations of the CAA and the applicable Benzene Waste NESHAP regulations will continue.

135. ExxonMobil's violations of the CAA, as set forth in this Claim for Relief, make the Defendants subject to injunctive relief and civil penalties of up to: (i) $25,000 per day for each violation on or before January 30, 1997; (ii) $27,500 per day for each violation between January 30, 1997 and March 15, 2004; and (iii) $32,500 per day for each violation occurring after March 15, 2004.

## EIGHTH CLAIM FOR RELIEF
### (RCRA Violations Concerning the Joliet Refinery's Wastewater Treatment Plant Area)

136. The allegations in Paragraphs 1 through 135 are hereby re-alleged and incorporated by reference as if fully set forth herein.

31

137. Upon information and belief, the ExxonMobil Joliet Refinery violated RCRA requirements based on past unauthorized treatment, storage, and/or disposal of certain types of hazardous waste – including benzene-containing wastewater and/or petroleum refinery primary oil/water/solids separator sludge – in the diversion basin and/or the equalization/biological treatment unit in the wastewater treatment plant area at the Joliet Refinery. More specifically, upon information and belief:

      a. ExxonMobil failed to obtain a RCRA permit for treatment, storage, and/or disposal of such hazardous waste in the diversion basin and/or the equalization/biological treatment unit, as required by RCRA and the applicable regulations, including Ill. Admin. Code tit. 35, § 703.121.

      b. In treating, storing, and/or disposing of such hazardous waste in the diversion basin and/or the equalization/biological treatment unit, ExxonMobil failed to comply with the standards applicable to owners and operators of treatment, storage, and/or disposal facilities, as required by RCRA and the applicable regulations, including Ill. Admin. Code tit. 35, Part 724.

      c. In treating, storing, and/or disposing of such hazardous waste in the diversion basin and/or the equalization/biological treatment unit, ExxonMobil failed to ensure that the waste no longer exhibited a prohibited characteristic of hazardous waste at the point of land disposal, as required by RCRA and the applicable LDRs, including Ill. Admin. Code tit. 35, § 728.101.

138. ExxonMobil's violations of RCRA, as set forth in this Claim for Relief, make ExxonMobil subject to injunctive relief and civil penalties of up to: (i) $25,000 per day for each violation on or before January 30, 1997; (ii) $27,500 per day for each violation between

32

January 30, 1997 and March 15, 2004; and (iii) $32,500 per day for each violation occurring after March 15, 2004.

## NINTH CLAIM FOR RELIEF
### (RCRA Violations Concerning the Joliet Refinery's Material Staging Area)

139.    The allegations in Paragraphs 1 through 138 are hereby re-alleged and incorporated by reference as if fully set forth herein.

140.    Upon information and belief, the ExxonMobil Joliet Refinery violated RCRA requirements based on past unauthorized treatment, storage, and/or disposal of certain hazardous wastes – including hazardous paint wastes and/or certain hazardous sludge wastes – in the Joliet Refinery's Material Staging Area.  More specifically, upon information and belief:

a.    ExxonMobil failed to obtain a RCRA permit for treatment, storage, and/or disposal of such hazardous waste in the Joliet Refinery's Material Staging Area, as required by RCRA and the applicable regulations, including Ill. Admin. Code tit. 35, § 703.121.

b.    In treating, storing, and/or disposing of such hazardous waste in the Joliet Refinery's Material Staging Area, ExxonMobil failed to comply with the standards applicable to owners and operators of treatment, storage, and/or disposal facilities, as required by RCRA and the applicable regulations, including Ill. Admin. Code tit. 35, Part 724.

141.    ExxonMobil's violations of RCRA, as set forth in this Claim for Relief, make ExxonMobil subject to injunctive relief and civil penalties of up to:  (i) $25,000 per day for each violation on or before January 30, 1997; (ii) $27,500 per day for each violation between

January 30, 1997 and March 15, 2004; and (iii) \$32,500 per day for each violation occurring after March 15, 2004.

## TENTH CLAIM FOR RELIEF
### (CWA Violations at the Joliet Refinery)

142.    The allegations in Paragraphs 1 through 141 are hereby re-alleged and incorporated by reference as if fully set forth herein.

143.    Upon information and belief, the ExxonMobil Joliet Refinery violated the CWA, regulations implementing the CWA, and the Joliet Refinery's NPDES permit issued pursuant to the CWA, as follows:

    a.    Upon information and belief, the ExxonMobil Joliet Refinery violated CWA requirements based on past unauthorized discharge of pollutants from the Joliet Refinery's coke pile to navigable waters of the United States.

    b.    Upon information and belief, the ExxonMobil Joliet Refinery violated CWA requirements based on past unpermitted discharge of pollutants or discharge of pollutants in excess of the allowable NPDES permit limits to navigable waters of the United States, as set forth in Table of Alleged CWA Violations attached as Attachment A to this Complaint.

    c.    Upon information and belief, the ExxonMobil Joliet Refinery violated CWA requirements based on past exceedance of combined outfall temperature limits imposed by Special Condition 2 of the Joliet Refinery's NPDES Permit at certain times between May 1996 and October 2004.

144.    ExxonMobil's violations of the CWA, as set forth in this Claim for Relief, make ExxonMobil subject to injunctive relief and civil penalties of up to: (i) \$25,000 per day for each

34

violation on or before January 30, 1997; (ii) $27,500 per day for each violation between

January 30, 1997 and March 15, 2004; and (iii) $32,500 per day for each violation occurring

after March 15, 2004.

## ELEVENTH CLAIM FOR RELIEF
### (Failure to Report Certain Releases at the Joliet Refinery and Billings Refinery as Required By CERCLA Section 103 and EPCRA Section 304)

145.     The allegations in Paragraphs 1 through 144 are hereby re-alleged and

incorporated by reference as if fully set forth herein.

146.     Upon information and belief, at the Joliet Refinery and at the Billings Refinery,

ExxonMobil violated release reporting requirements under CERCLA Section 103, 42 U.S.C.

§ 9603, on certain occasions set forth in the Table of Alleged CERCLA/EPCRA Violations

attached as Attachment B to this Complaint. More specifically, upon information and belief,

ExxonMobil failed to report certain releases listed on Attachment B to the National Response

Center as required by CERCLA Section 103.

147.     Upon information and belief, at the Joliet Refinery and at the Billings Refinery,

ExxonMobil violated release reporting requirements under EPCRA Section 304, 42 U.S.C.

§ 11004, on certain occasions set forth in Table of Alleged CERCLA/EPCRA Violations

attached as Attachment B to this Complaint. More specifically, upon information and belief,

ExxonMobil failed to make an immediate report to the appropriate SERC and/or to the

appropriate LEPC for certain releases listed on Attachment B, and/or failed to provide a written

followup notice as soon as practicable after the release, as required by EPCRA Section 304,

42 U.S.C. § 11004.

148.     ExxonMobil's violations of release reporting requirements under CERCLA

Section 103 and EPCRA Section 304, as set forth in this Claim for Relief, make ExxonMobil

35

subject to injunctive relief and civil penalties of up to: (i) \$25,000 per day for each day the violation continued, and \$75,000 per day for each day that any second or subsequent violation continued, for any violation that occurred on or before January 30, 1997; (ii) \$27,500 per day for each day the violation continued, and \$82,500 per day for each day that any second or subsequent violation continued, for any violation that occurred between January 30, 1997 and March 15, 2004; and (iii) \$32,500 per day for each day the violation continued, and \$97,500 per day for each day that any second or subsequent violation continued, for any violation that occurred after March 15, 2004.

## TWELFTH CLAIM FOR RELIEF
### (RCRA Violations at the Billings Refinery)

149.    The allegations in Paragraphs 1 through 148 are hereby re-alleged and incorporated by reference as if fully set forth herein.

150.    Upon information and belief, the ExxonMobil Billings Refinery violated RCRA, regulations implementing RCRA, and the Billings Refinery's permit issued pursuant to RCRA, as follows:

a.    Upon information and belief, the ExxonMobil Billings Refinery violated RCRA requirements based on storage of the following uncharacterized wastes in the scrap yard and/or lay down area at the Billings Refinery: heat exchanger bundles containing possible heat exchanger bundle cleaning sludge, welding rods, discarded aerosol cans, discarded insulation, and refrigeration and air conditioning equipment (as identified during June 2002 and/or July 2002 EPA inspections at the Billings Refinery).

36

b.      Upon information and belief, the ExxonMobil Billings Refinery violated

RCRA requirements based on application of waste at the Billings Refinery's Land

Treatment Unit during periods of high winds (as identified during June 2002 and/or July

2002 EPA inspections at the Billings Refinery).

151.    ExxonMobil's violations of RCRA, as set forth in this Claim for Relief, make

ExxonMobil subject to injunctive relief and civil penalties of up to: (i) $25,000 per day for each

violation on or before January 30, 1997; (ii) $27,500 per day for each violation between

January 30, 1997 and March 15, 2004; and (iii) $32,500 per day for each violation occurring

after March 15, 2004.

## THIRTEENTH CLAIM FOR RELIEF
### (CWA Violations at the Billings Refinery)

152.    The allegations in Paragraphs 1 through 151 are hereby re-alleged and

incorporated by reference as if fully set forth herein.

153.    Upon information and belief, the ExxonMobil Billings Refinery violated CWA

Section 301(a), 33 U.S.C. § 1311(a), regulations implementing the CWA, and the Billings

Refinery's permits issued pursuant to the CWA, as follows:

a.      Upon information and belief, the ExxonMobil Billings refinery violated

Montana Pollutant Discharge Elimination System ("MPDES") Permit MT0000477, Parts

I.C.1.a and I.C.3 based on the acute toxicity of samples collected from outfall 001 on

December 4, 2001, December 25, 2001, January 31, 2002, February 26, 2002, March 19,

2002, April 23, 2002, May 28, 2002, and June 12, 2002 (as identified during June 2002

and/or July 2002 EPA inspections at the Billings Refinery).

37

b.     Upon information and belief, the ExxonMobil Billings Refinery violated
MPDES Permit MT0000477, Part I.C.1. Outfall 002: Non-Contact Cooling Water based
on discharges causing visible oil sheens at outfall 002 during November 2000, November
2001, February 2002 and March 2002 (as identified during June 2002 and/or July 2002
EPA inspections at the Billings Refinery).

c.     Upon information and belief, the ExxonMobil Billings Refinery violated
the General Permit for Stormwater Discharges Associated with Industrial Activity MTR
000000 (Authorization 000104) based on:  (i) the failure of the Billings Refinery Storm
Water Pollution Prevention Plan ("SWPPP") to identify certain potential sources of
pollution to storm water discharges associated with the scrap metal yard located in the
South Refinery Drainage Area; and (ii) the SWPPP's failure to provide an up-to date
identification of the individual responsible for implementing the SWPPP (as identified
during June 2002 and/or July 2002 EPA inspections at the Billings Refinery).

d.     Upon information and belief, the ExxonMobil Billings Refinery violated
40 C.F.R. § 112.5(a) based on failure to incorporate a December 29, 1999 amendment to
the Billings Refinery's Spill Prevention Control and Countermeasure Plan ("SPCC Plan")
into the February 28, 2000 version of the Refinery's SPCC Plan (as identified during
June 2002 and/or July 2002 EPA inspections at the Billings Refinery).

e.     Upon information and belief, the ExxonMobil Billings Refinery violated
CWA requirements concerning management of materials in Tank 350 (as identified by
EPA during its July 2002 inspection).

154.    ExxonMobil's violations of the CWA, as set forth in this Claim for Relief, make
ExxonMobil subject to injunctive relief and civil penalties of up to:  (i) $25,000 per day for each

violation on or before January 30, 1997; (ii) $27,500 per day for each violation between January 30, 1997 and March 15, 2004; and (iii) $32,500 per day for each violation occurring after March 15, 2004.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, the United States, Illinois, Louisiana, and Montana, respectfully request that this Court:

1.     Order ExxonMobil to immediately comply with the statutory and regulatory requirements cited in this Complaint;

2.     Order ExxonMobil to take appropriate measures to mitigate the effects of its violations;

3.     Assess civil penalties against ExxonMobil for up to the amounts provided in the applicable statutes; and

4.    Grant the United States, Illinois, Louisiana, and Montana such other relief as this

Court deems just and proper.

FOR THE UNITED STATES OF AMERICA

Date: 10/3/05

*Kelly A Johnson*

KELLY A. JOHNSON
Acting Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice
Washington, DC   20530

Date: 9/30/2005

*Randall M. Stone*

RANDALL M. STONE
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC   20044-7611

Phone:        (202) 514-1308
Fax:          (202) 616-6584

PATRICK J. FITZGERALD
United States Attorney

LINDA WAWZENSKI
Assistant United States Attorney
Northern District of Illinois
219 S. Dearborn Street – 5th Floor
Chicago, IL   60604

OF COUNSEL:

ROBERT D. PARRISH
Attorney-Advisor
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, NW
Washington, DC   20460

40

FOR THE STATE OF ILLINOIS

LISA MADIGAN,
Attorney General of the State of Illinois

MATTHEW J. DUNN, Chief
Environmental Enforcement/Asbestos Litigation
Division

Date: 9/13/05

ROSEMARIE CAZEAU, Chief
Environmental Bureau
Assistant Attorney General
188 West Randolph St. – 20th Floor
Chicago, IL   60601

Phone:        (312) 814-3094
Fax:          (312) 814-2347

FOR THE STATE OF LOUISIANA

CHARLES C. FOTI, JR.
Attorney General

Date: 9/15/05

Megan K. Terrell
Assistant Attorney General
Louisiana Department of Justice
P.O. Box 94005
Baton Rouge, LA   70804-9005


FOR THE LOUISIANA DEPARTMENT OF
ENVIRONMENTAL QUALITY

MIKE D. McDANIEL, Ph.D.
Secretary

Date: 9-22-05

TED R. BROYLES, II
Attorney III
Office of the Secretary
Legal Affairs Division
Louisiana Department of Environmental Quality
P.O. Box 4302
Baton Rouge, LA   70821-4302

Phone:        (225) 219-3985
Fax:          (225) 219-4068

FOR THE STATE OF MONTANA

RICHARD OPPER
Director
Montana Department of Environmental Quality

Date: 9/20/05

DAVID RUSOFF
Special Assistant Attorney General
Montana Department of Environmental Quality
P.O. Box 200901
Helena, MT   59620-0901

Phone:        (406) 444-2626
Fax:          (406) 444-4386

43

**ATTACHMENT A:**       **Table of Alleged CWA Violations at the Joliet Refinery Referenced in the Tenth Claim for Relief**

The Tenth Claim for Relief encompasses all of the following alleged CWA violations:

| Month and Year | Outfall No. | Parameter and Other Details |
|---|---|---|
| 1/1996 | 003 | total organic carbon (daily maximum mg/l) |
| 2/1996 | 003 | total organic carbon (daily maximum mg/l) |
| 3/1996 | 001 | biological oxygen demand (daily maximum mg/l - 4 days during month) |
| 3/1996 | 001 | total suspended solids (daily maximum mg/l - 2 days during month) |
| 4/1996 | 001 | biological oxygen demand (daily maximum mg/l) |
| 4/1996 | 001 | ammonia (daily maximum mg/l) |
| 4/1996 | 003 | total organic carbon (daily maximum mg/l) |
| 6/1996 | 003 | total organic carbon (daily maximum mg/l) |
| 7/1996 | 003 | total organic carbon (daily maximum mg/l) |
| 9/1996 | 001 | total suspended solids (monthly average mg/l) |
| 9/1996 | 001 | total suspended solids (daily maximum mg/l) |
| 5/1997 | 001 | total suspended solids (daily maximum mg/l) |
| 5/1997 | 001 | ammonia (daily maximum mg/l) |
| 12/1997 | 002 | total organic carbon (daily maximum mg/l) |
| 6/1998 | 001, 002, 003 | total residual chlorine (daily maximum mg/l) |
| 12/1998 | 003 | total organic carbon (daily maximum mg/l) |
| 1/1999 | 001 | total suspended solids (monthly average lb/day) |
| 1/1999 | 001 | total suspended solids (daily maximum mg/l) |
| 6/1999 | 001 | total suspended solids (daily maximum mg/l) |
| 6/1999 | 001 | total suspended solids (daily maximum lb/day) |
| 6/1999 | -- | oil sheen on river |
| 7/1999 | 002 | total organic carbon (daily maximum mg/l) |
| 8/1999 | 002 | total organic carbon (daily maximum mg/l) |
| 8/1999 | 003 | total organic carbon (daily maximum mg/l) |
| 9/1999 | 001 | total suspended solids (daily maximum mg/l) |
| 9/1999 | 001 | total suspended solids (monthly average lb/day) |
| 5/2000 | 002 | total organic carbon (daily maximum mg/l) |
| 6/2000 | 005 | unauthorized discharge of 2 gallons of oil (Special Condition 9) |
| 10/2000 | 001, 002, 003 | total residual chlorine (daily maximum mg/l) |
| 11/2000 | 001 | total suspended solids (daily maximum mg/l) |
| 7/2001 | 004 | total organic carbon (daily maximum mg/l) |

**ATTACHMENT A:**     **Table of Alleged CWA Violations at the Joliet Refinery Referenced in the Tenth Claim for Relief (continued)**

| Month and Year | Outfall No. | Parameter and Other Details |
|---|---|---|
| 10/2001 | 002 | total organic carbon (daily maximum mg/l) |
| 10/2001 | 008 | unauthorized discharge of 2 gallons of oil (Special Condition 9) |
| 10/2001 | | oil sheen on river |
| 11/2001 | 002 | total organic carbon (daily maximum mg/l) |
| 1/2002 | 001, 002, 003 | total residual chlorine (daily maximum mg/l) |
| 5/2002 | 001, 002, 003 | total residual chlorine (daily maximum mg/l) |
| 8/2002 | 001, 002, 003 | total residual chlorine (daily maximum mg/l) |
| 9/2003 | – | chromium |
| 10/2002 | 001 | ammonia (daily maximum mg/l) |
| 11/2002 | 001 | ammonia (daily maximum mg/l - 4 days during month) |
| 11/2002 | 005 | oil and grease (daily maximum mg/l) |
| 12/2002 | 001 | ammonia (daily maximum mg/l - 7 days during month) |
| 3/2003 | 003 | total organic carbon (daily maximum mg/l) |
| 5/2003 | 003 | total organic carbon (daily maximum mg/l) |
| 6/2003 | 004 | oil and grease (daily maximum mg/l) |
| 4/2004 | 001 | ammonia (daily maximum mg/l - 3 days during month) |
| 5/2004 | 008 | oil and grease (daily maximum mg/l) |
| 5/2004 | 001 | ammonia (daily maximum mg/l - 2 days during month) |
| 6/2004 | 001 | ammonia (daily maximum mg/l) |
| 6/2004 | 003 | pH (daily maximum SU) |
| 8/2004 | 008 | total organic carbon (daily maximum mg/l) |
| 8/2004 | 001 | pH (daily maximum SU) |
| 11/2004 | 001 | ammonia (daily maximum mg/l) |
| 12/2004 | 001 | ammonia (daily maximum mg/l) |
| 1/2005 | 003 | total organic carbon (daily maximum mg/l - 2 days during month) |

**ATTACHMENT B:**     **Table of Alleged CERCLA/EPCRA Violations Referenced in the Eleventh Claim for Relief**

    1.    Joliet Refinery:  The Eleventh Claim for Relief encompasses all violations of reporting requirements under CERCLA Section 103 and EPCRA Section 304 for the following release incidents:

| Date of Chemical Release | Chemical |
| --- | --- |
| 3/18/2005 | nitrogen oxides |
| 1/14/2005 | sulfur dioxide and nitrogen oxide |
| 5/14/2004 | nitrogen oxides, nitrogen dioxide, hydrogen sulfide and sulfur dioxide |
| 11/2/2003 | hydrogen sulfide and sulfur dioxide |
| 10/7/2003 | nitrogen oxides and sulfur dioxide |
| 10/4/2003 | nitrogen oxides |
| 10/24/2002 | nitrogen oxides |
| 9/5/2002 | nitrogen oxides |
| 8/24/2002 | nitrogen oxides and sulfur dioxide |
| 6/1/2002 | nitrogen dioxide, nitrogen oxides and sulfur dioxide |
| 4/6/2002 | nitrogen oxides |
| 3/4/2002 | nitrogen oxides and sulfur dioxide |
| 2/24/2002 | nitrogen dioxide and sulfur dioxide |
| 9/27/1999 | benzene |
| 3/29/1999 | nitrogen dioxide and/or nitrogen oxides |
| 2/20/1999 | hydrogen sulfide |
| 2/5/1999 | benzene |
| 1/5/1999 | nitrogen oxides |
| 5/23/1998 | nitrogen oxides |
| 5/5/98 | nitrogen oxides |
| 2/21/1997 | hydrogen sulfide |
| 3/17/1996 | nitrogen oxides |

    2.    Billings Refinery:  The Eleventh Claim for Relief encompasses all violations of reporting requirements under CERCLA Section 103 and EPCRA Section 304 identified during the June 2002 and/or July 2002 EPA inspections at the Billings Refinery.

## CERTIFICATE OF SERVICE

I hereby certify that I caused true and correct copies of the foregoing COMPLAINT to be served by first class mail, postage pre-paid, on the following persons, in accordance with Paragraph 261 of the proposed Consent Decree in this case:

Assistant General Counsel, Litigation
Law Department
Exxon Mobil Corporation
800 Bell Street
ExxonMobil Building, Room 1503B
Houston, TX   77022

James F. Sanders
Neal & Harwell, PLC
Suite 2000, One Nashville Place
150 Fourth Avenue North
Nashville, TN   37219

J. Kevin French
Counsel
Downstream Companies
Exxon Mobil Corporation
3225 Gallows Road, Room 3D2126
Fairfax, VA   22037

Robert D. Parrish
Attorney-Advisor
U.S. Environmental Protection Agency
Mail Code 2248A
1200 Pennsylvania Avenue, NW
Washington, DC   20460

Rosemarie Cazeau
Rebecca Burlingham
Environmental Bureau
Office of the Illinois Attorney General
188 West Randolph St. – 20th Floor
Chicago, IL   60601

Ted R. Broyles, II
Attorney
Office of the Secretary
Legal Affairs Division
Louisiana Department of
Environmental Quality
P.O. Box 4302
Baton Rouge, LA   70821-4302

David Rusoff
Special Assistant Attorney General
Montana Department of
Environmental Quality
P.O. Box 200901
Helena, MT   59620-0901

Dated:   _10/11/2005_

_Randall M. Stone_
Randall M. Stone